UNITED STATES DISTRICT COURT                b
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| JOHN MCCARY WILLIAMS | CIVIL ACTION NO. 2:16-CV-01367 |
| VERSUS | JUDGE TRIMBLE |
| NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY[1] | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

I.  **Background**

  A.  **Procedural Background**

John McCary Williams ("Williams") filed applications for disability insurance benefits ("DIB") and social security income ("SSI") benefits on July 20, 2009 (Doc. 9-1, pp. 469, 473/728), alleging a disability onset date of August 15, 2008 (Doc. 9-1, pp. 195, 469/728).  Williams contends he is unable to work due to "left hand, lung problems, hbp, can't read or write" (Doc. 9-1, p. 497/728).  Those applications were denied by the Social Security Administration ("SSA") (Doc. 9-1, p. 195/728).

A de novo hearing was held before an Administrative Law Judge ("ALJ") in 2010 (Doc. 9-1, p. 32-61/728).  The ALJ's decision was unfavorable to Williams (Doc. 9-1, p. 159-68/728).  The Appeals Council vacated that decision, in part because the ALJ denied Williams' request to subpoena the consulting doctor on whom the ALJ relied, Dr. Whiteman, and remanded the case for further proceedings (Doc. 9-1, p. 173-75/728).

---

[1] Nancy Berryhill became Acting Commissioner on January 23, 2017.

A second administrative hearing was held in 2011 (Doc. 9-1, p. 118-51/728). The ALJ's decision was again unfavorable to Williams (Doc. 9-1, p. 180-87/728). The Appeals Council again vacated that decision because Dr. Whiteman failed to respond to his subpoena and the ALJ failed to enforce it (Doc. 9-1, p. 193-94/728). The Appeals Council remanded the case for further proceedings (Doc. 9-1, p. 193-94/728).

A third administrative hearing was held in March 2015. Dr. Whiteman again failed to respond to his subpoena, so the hearing was continued (Doc. 9-1, p. 113-16/728).

A fourth administrative hearing was held in July 2015, at which Dr. Whiteman appeared (Doc. 9-1, p. 62-112/728). The ALJ found that, although Williams suffers from severe impairments of borderline intellectual functioning, intellectual disability, diabetes mellitus, and left hand dysfunction (Doc. 9-1, p. 19/728), he has the residual functional capacity to perform very heavy work except for his inability to understand, remember, or carry out more than simple and routine one-, two-, or three-step instructions; his inability to perform work requiring more than simple reading, writing, or arithmetic; and his limitation to making only simple, work-related decisions or judgments (Doc. 9-1, p. 20/728). The ALJ further found that, since June 2, 2014, Williams's impairments met the criteria of § 12.05(C) of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Doc. 9-1, p. 23/728). The ALJ concluded that Williams was not disabled prior to June 2, 2014, but became disabled on June 2, 2014 and remained disabled through the date of his decision on August 26, 2015 (Doc. 9-1, p. 25/728).

Williams requested a review of the ALJ's decision, but the Appeals Council declined to review it (8/5/16) (Doc. 9-1, p. 6/728).  The ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Williams next filed this appeal for judicial review of the final decision of the Commissioner.  Williams raises the following issues on appeal (Doc. 14):

1. The ALJ failed to employ a medical expert trained in psychology/psychiatry, 20 C.F.R. § 404.1527, 416.927, HALLEX 1-2-530, to determine whether Williams suffered from "severe borderline intellectual functioning" or "severe intellectual disability" from August 15, 2008 to June 4, 2015, SSR 83-20.

2. The ALJ failed to apply the correct severity standard, Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985), to the claimant's combined impairments; failed to elicit the informed judgment of a medical advisor; and failed to obtain an expert opinion in internal medicine to determine whether the claimant suffered from severe essential hypertension during from August 15, 2008 through September 30, 2010 (the date last insured for DIB).

The Commissioner responded to Williams's appeal (Doc. 16), and Williams filed a reply (Doc. 17).  Williams's appeal is now before the Court for disposition.

B.    **Medical and Other Records**

In January 2008, Williams went to the emergency room complaining of upper left chest pain that was constant and worsened when he bent over (Doc. 9-1, p. 707/728).  Williams's speech was slurred, and he admitted he was an alcoholic and had not been taking his medications for hypertension (Doc. 9-1, p. 707/728).  Williams's blood pressure was 196/119, he was 5'9" tall, and he weighed 189 pounds (Doc. 9-1, p. 707/728).  Williams was diagnosed with hypertension and costochondritis (Doc. 9-1, p. 707/728).

In October 2008, Williams's blood pressure was 138/90 (Doc. 9-1, p. 703/728). Williams's speech was clear and he reported smoking one pack of cigarettes per day (Doc. 9-1, p. 703/728). In November 2008, Williams's blood pressure was 165/107 and he wanted to resume taking blood pressure medication (Doc. 9-1, p. 701/728). Williams's speech was clear (Doc. 9-1, p. 701/728). Williams reported chronic pain and problems with his left hand since he burned it as a child, and scarring was noted (Doc. 9-1, p. 701/728). Williams admitted smoking two, or maybe three, packs of cigarettes per day (Doc. 9-1, p. 701/728).

In January 2009, Williams was evaluated by Dr. Kelly Babineaux for the state disability determinations services (Doc. 9-1, p. 725/728). Williams reported left hand weakness, lung problems, and high blood pressure (Doc. 9-1, p. 725/728). Williams also stated he was in recovery from drug and alcohol abuse, had hypertension, and had a throbbing headache about twice a week for one hour (Doc. 9-1, p. 725/728). Williams admitted he can dress and feed himself; stand for 30 minutes at a time and a total of 6 hours in an 8 hour day; walk on level ground for one mile; lift 150 pounds; drive for five hours; climb stairs; and sweep, mop, vacuum, mow grass, and do dishes (Doc. 9-1, p. 725/728). Williams was working part time doing plaster work (Doc. 9-1, p. 577/728). Williams reported decreased vision and hearing, and smoking one and a half packs per day since age nine (Doc. 9-1, p. 726/728).

Williams was 5'9" tall and weighed 180 pounds, his blood pressure was 175/105, and his vision was 20/200 OD and 20/70 OS without glasses (Doc. 9-1, p. 726/728). Williams admitted he had not been taking his blood pressure medication

(Doc. 9-1, p. 727/728).   Williams's grip strength was normal bilaterally; he had difficulty apposing his left fifth digit to his thumb; he could not touch the second through fifth fingers of his left hand to his left palm due to the burn wound; he had some webbing between the third and fourth, and fourth and fifth fingers from the burn; he was able to do most fine dexterous movements; and he could grip and make a fist (Doc. 9-1, p. 727/728).   Dr. Babineaux concluded that Williams would probably take care of getting his blood pressure medication, and he had a good range of motion (Doc. 9-1, p. 728/728).

In June 2009, Williams went to the emergency room, complaining of pain (8/10) in his low back, upper back, shoulders, and left hand (Doc. 9-1, p. 577/728).   Williams's pain was atraumatic and he was noted to be non-compliant with his medication regimen (Doc. 9-1, p. 577/728).   Williams denied smoking tobacco (Doc. 9-1, p. 577/728).   Williams also complained of shortness of breath and headache but did not have dyspnea or chest pain (Doc. 9-1, p. 577/728).   Williams, then 48 years old, was diagnosed with "trigger finger"[2] and radiculopathy without neuropathy, and prescribed amitriptyline and tramadol (Doc. 9-1, p. 577/728).   Williams's blood pressure was 210/117 (Doc. 9-1, p. 577/728).

On July 7, 2009, Williams had a follow-up visit (Doc. 9-1, p. 580/728).   Williams was 71 inches tall (Doc. 9-1, p. 580/728).   Williams's blood pressure was 198/116 and

---

[2] Trigger finger, or stenosing tenosynovitis, is a condition in which one of your fingers gets stuck in a bent position.  The finger may bend or straighten with a snap, or may become locked in a bent position. See MedlinePlus Health Information, Medical Encyclopedia (https://medlineplus.gov): Trigger finger, at Mayo Foundation for Medical Education and Research (a service of the U.S. National Library of Medicine and the National Institutes of Health).

he admitted to smoking one pack per day (Doc. 9-1, p. 580/728).  Williams was prescribed Clonidine, Lisinopril, and Trazodone, and told to quit smoking (Doc. 9-1, p. 580/728).

On July 11, 2009, Williams went to the emergency room again, complaining of back pain (Doc. 9-1, p. 581/728).  His blood pressure was 164/95 and he weighed 180 pounds (Doc. 9-1, p. 581/728).  X-rays of Williams's lumbar spine were negative (Doc. 9-1, p. 585/728).  Chest x-rays showed no acute disease (Doc. 9-1, p. 586/728). Williams was diagnosed with a urinary tract infection and low back pain, and prescribed Cipro and Ultram (Doc. 9-1, p. 581/728).

Williams underwent a psychological evaluation by Jerry L. Whiteman, Ph.D., in August 2009 (Doc. 9-1, p. 588/728).  Williams, then 48 years old, complained of sleep difficulties and breathing problems, attributing his health problems to a fall and a stab wound (Doc. 9-1, p. 588/728).  Williams also admitted a history of polysubstance abuse beginning at age 14 and a history of alcoholism, but said he stopped using drugs and alcohol one year ago (Doc. 9-1, p. 588/728).  Dr. Whiteman noted that Williams's eyes were red at the time of the assessment (Doc. 9-1, p. 588/728).  Williams was last employed about a year before as a laborer/plasterer (Doc. 9-1, p. 588/728).  Williams said he was 5'8" tall and weighed 165 pounds, was single, had one child, and lived alone in his family home (Doc. 9-1, p. 589/728).  Williams had one friend he talked to, sometimes went to rodeos, frequently attended AA and NA meetings, and struggled with insomnia (Doc. 9-1, p. 589/728).  Williams attended

6

school through the seventh grade, repeating all grades from the fourth through the seventh before he quit school (Doc. 9-1, p. 589/728).

In 2009, Williams's full scale IQ was 71 (borderline intelligence), his verbal comprehension index was 66, his perceptual reasoning index was 81, his working memory index was 69, and his processing speed index was 86 (Doc. 9-1, p. 589/728). Dr. Whiteman diagnosed Williams with polysubstance abuse at Axis I, and borderline intelligence at Axis II (Doc. 9-1, p. 589/728). Williams said he did not drive because his license was suspended due to his history of DWIs (Doc. 9-1, p. 588/728). Dr. Whiteman found Williams was clean and sober at that time, was attending AA and NA meetings to stay sober, and there were no signs of malingering during the evaluation (Doc. 9-1, p. 589/728). Dr. Whiteman stated Williams's ability to manage personal finances is limited to simple transactions (Doc. 9-1, p. 589/728). Dr. Whiteman further found Williams has the ability to understand and follow concrete instructions, but abstract directions would be performed inconsistently.

In August 2009, Linda Upton, Ph.D., a non-examining, consulting psychologist employed by the state disability determinations services, found Williams was mentally able to do simple work due to borderline intellectual functioning and a history of polysubstance abuse in remission (Doc. 9-1, pp. 590-600/728). Dr. Upton found Williams has mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace (Doc. 9-1, p. 601/728).

Dr. Upton completed a mental residual functional capacity assessment for Williams in 2009 (Doc. 9-1, p. 605/728).  Dr. Upton found, in understanding and memory, that Williams is moderately limited in his ability to understand and remember detailed instructions (Doc. 9-1, p. 605/728).  Dr. Upton also found, in sustained concentration and persistence, that Williams is moderately limited in his ability to carry out detailed instructions; moderately limited in his ability to maintain attention and concentration for extended periods; moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and moderately limited in his ability to perform at a consistent pace without an unreasonable number and length of rest periods (Doc. 9-1, pp. 605-06/728).  Dr. Upton did not find any limitations in social interaction or adaptation (Doc. 9-1, p. 606/728).

In 2011, the Calcasieu Parish School System wrote that Williams entered Riverside Elementary School as a first grader in 1967 (Doc. 9-1, p. 527/728).  In 1976, Williams transferred to Oak Park Junior High, but Oak Park does not have any school records for Williams (Doc. 9-1, p. 527/728).  Also, the Louisiana State Department of Education did not have a record of Williams receiving his GED (Doc. 9-1, p. 527/728).

Dr. Whiteman evaluated Williams's mental status in August 2013 (Doc. 9-1, p. 633/728).  Williams, then 51 years old, still did not drive or have a valid driver's license (Doc. 9-1, pp. 633, 636/728).  Williams complained he cannot use his hands, is short-winded, and has high blood pressure (Doc. 9-1, p. 633/728).  Williams reported

he had been married one time, was divorced in April 2013, and lived alone in his family home (Doc. 9-1, p. 633/728). Williams reported having been stabbed in the chest 28 years ago, and shot in his "manhood" seven years ago (Doc. 9-1, p. 634/728). Williams was attending NA and AA meetings three times per week, and had been arrested/incarcerated many times for drug and alcohol related issues and failure to pay child support, the last time in 2009 (Doc. 9-1, p. 634/728). Williams said he was 5'10" tall and weighed 210 pounds (Doc. 9-1, p. 634/728). Williams reported a troubled sleep cycle, but denied having any pain (Doc. 9-1, p. 634/728). Williams went through the seventh grade and quit school when he was 16 years old (Doc. 9-1, p. 634/728). Williams was last employed six years ago, doing drywall (Doc. 9-1, p. 634/728). Williams was fired from that job, but does not know why (Doc. 9-1, p. 634/728).

Dr. Whiteman found Williams's general fund of information and long term memory skills are below average but adequate; his pace and persistence are modest; he often uses his fingers for math calculations; he reads slowly and has difficulty spelling; his short term memory and concentration skills are adequate; and his intermediate memory is poor (Doc. 9-1, p. 635/728). Williams has limited ability for abstract reasoning, his judgment and insight reflect knowledge of basic emergency responses, and his primary goal in life is just to be happy (Doc. 9-1, p. 635/728). Dr. Whiteman found Williams's cognitive abilities are borderline but adequate (Doc. 9-1, p. 636/728).

Dr. Whiteman also filled out a mental residual functional capacity assessment in August 2013 (Doc. 9-1, pp. 630-32/728). At that time, Williams reported he had

been clean and sober for 4 years (Doc. 9-1, p. 631/728).  Dr. Whiteman found that, due to his borderline IQ, Williams has a mild limitation in his ability to make judgments on simple work-related decisions; a moderate limitation in his ability to understand and remember complex instructions; a moderate limitation in his ability to carry out complex instructions; and a moderate limitation in his ability to make judgments on complex work-related decisions (Doc. 9-1, p. 630/728).  Dt. Whiteman also found Williams has a moderate limitation in his ability to respond appropriately to usual work situations and to changes in a routine work setting (Doc. 9-1, p. 631/728).

In early June 2014, Williams refilled his clonidine, hydrochloride, and lisinopril (Doc. 9-1, p. 659/728).  His blood pressure was up, at 167/101, because he had been out of blood pressure medication (Doc. 9-1, pp. 649, 655, 659/728).  Williams also complained of head and chest pain, blurred vision, and weight loss in the last six months (he weighed 184 pounds) (Doc. 9-1, pp. 654, 658/728).  Two weeks later, Williams's blood pressure was 134/87 and his glucose was 1000 (Doc. 9-1, p. 652/728).  He had fatigue/weakness of unknown etiology, and he was newly diagnosed with diabetes with hyperglycemia and hyperosmolar state,[3] and trichomonas (an STD) (Doc. 9-1, p. 652, 654/728).

---

[3] Diabetic hyperglycemic hyperosmolar syndrome ("HHS") is a complication of type 2 diabetes. It involves extremely high blood sugar (glucose) level without the presence of ketones. HHS is a condition of: (1) extremely high blood sugar (glucose) level; (2) extreme lack of water (dehydration); and (3) decreased alertness or consciousness (in many cases).  It is a condition in which the blood has a high concentration of salt (sodium), glucose, and other substances. This draws the water out of the body's other organs, including the brain.  MedlinePlus Health Information, Medical Encyclopedia: Diabetic hyperglycemic hyperosmolar syndrome, *available at* https://medlineplus.gov/ency/article/000304.htm (a service of the U.S. National Library of Medicine and the National Institutes of Health)

In July 2014, Williams refilled his insulin supplies (Doc. 9-1, pp. 645, 657/728). His blood pressure was 173/96, he was 5'9" tall, and he weighed 189 pounds (Doc. 9-1, p. 645/728).

In August 2014, Williams's blood pressure was 105/60, he weighed 191 pounds, and his blood sugar was 147 (Doc. 9-1, p. 643/728).  Williams was noted to be doing well (Doc. 9-1, p. 643/728).

In September 2014, Williams's blood pressure was 104/70 and his weight was up to 197 pounds (Doc. 9-1, p. 642/728).  Williams was diagnosed with hepatitis C (Doc. 9-1, p. 642/728).   Williams weighed 203 pounds at a follow-up visit in November (Doc. 9-1, p. 641/728).   Williams complained of blurry vision, so his vision was measured at 20/40 OS and 20/13 OD (Doc. 9-1, p. 641/728).    Williams was prescribed Harvoni for his hepatitis C (Doc. 9-1, p. 641/728).

In a follow-up visit in January 2015, Williams's blood pressure was 141/82, he weighed 204 pounds, and he was diagnosed with hepatitis C, hypertension, and diabetes mellitus (Doc. 9-1, p. 639/728).

C.    **July 2015 Administrative Hearing**

At Williams's fourth administrative hearing, held in July 2015, Williams appeared with his attorney, a vocational expert ("VE"), and Dr. Whiteman (Doc. 9-1, p. 62-112/728).

Williams testified that he was then 54 years old, about 5' 6" tall, and weighed 210 pounds (Doc. 9-1, p. 70/728).  Williams testified his heaviest weight in the last few years was 260 pounds (Doc. 9-1, p. 70/728).  Williams is right-handed, single, has

one grown son, and lives in a house with his fiancé (Doc. 9-1, pp. 70-71/728).  Williams grew up with his mother in Lake Charles, Louisiana (Doc. 9-1, p. 889/728).  Williams has two older siblings (Doc. 9-1, p. 88/728).  Williams testified his mother's primary language was French and she learned to speak English (Doc. 9-1, p. 88/728).

Williams testified he completed the fourth grade, but attended school through the seventh grade, spending two years in every grade from the fourth through the seventh (Doc. 9-1, pp. 71, 91/728).  Williams testified he started failing in the fourth grade, and had social promotions to the next grade each time he failed a grade twice (Doc. 9-1, pp. 71, 91/728).  Williams began having disciplinary problems (fighting, expulsions) in the fifth grade, with other students and authority figures (Doc. 9-1, pp. 91-92/728).   Williams left school at age 16, never attended high school, did not earn a GED, and does not have any vocational training (Doc. 9-1, pp. 71-72, 91/728).  Williams can read and write very little, cannot read a grocery list, and can add a little (Doc. 9-1, p. 72/728).  Williams testified that his mother was unable to help him with school (Doc. 9-1, p. 93/728).  Williams's sister took care of his bills and helped him handle his money when he was working (Doc. 9-1, p. 72/728).  Williams testified he did not stay in school because he could not understand things, which made him feel bad, he felt like people talked down to him, and he was angry (Doc. 9-1, pp. 92-93/728).

Williams testified that his sister filled out his social security application for him because he cannot read or write (Doc. 9-1, pp. 93-94/728).  Williams testified the statements on the application–that he completed the application himself and has a GED–are not true (Doc. 9-1, pp. 93-94/728).  Williams testified that, if he was awarded

Social Security benefits, it would be in his best interest to have someone handle his money for him (Doc. 9-1, p. 95/728).

Williams testified he has a driver's license (he got it back in 2014) and drives four times a week to AA and NA meetings (Doc. 9-1, p. 73/728).  Williams has been clean and sober for eight years (Doc. 9-1, p. 73/728).

Williams has not worked since 2008 (Doc. 9-1, p. 74/728).  From 2000 to 2008, Williams did construction labor, mostly clean-up work and as a helper to plasterers (Doc. 9-1, pp. 74-75/728).  Williams testified he stopped working because he had been shot, then he fell off a scaffold and suffered a broken rib and a collapsed lung (Doc. 9-1, p. 75/728).  Williams testified he decided to stop using drugs and alcohol because his life needed to change for the better (Doc. 9-1, p. 76/728).  Williams has had difficulty finding jobs because he cannot fill out a job application by himself, either by hand or on a computer (Doc. 9-1, p. 95/728).

Williams testified he has had high blood pressure about ten years, and his medication caused dizziness when he was working (Doc. 9-1, p. 76/728).  Williams has been a diabetic for two years, and he takes four shots per day—one at each meal and twice at night (Doc. 9-1, p. 77/728).  Williams testified that his diabetes causes dry mouth, makes him short-winded, and he cannot tolerate heat very well (Doc. 9-1, p. 77/728).  Williams lays down when he gets too hot, and it takes him two days to mow his yard (Doc. 9-1, p. 77/728).  However, Williams loves cold weather (Doc. 9-1, p. 87/728).  Williams also testified that he stays angry, and his lack of education makes him sad and stressed, and limits what he can do (Doc. 9-1, pp. 77-78/728).

Williams testified that he takes two insulins, blood pressure medication, an anti-depressant, and a prescription medicine to help him sleep (Doc. 9-1, pp. 85-86/728). Diabetes makes him very tired, weak, forgetful, and causes dry mouth and frequent urination (10 to 15 times per day) (Doc. 9-1, p. 96/728). His high blood pressure causes nausea, headaches (twice per week, lasting 30 minutes), and nosebleeds despite taking medication (Doc. 9-1, p. 96/728).

On an average day, Williams watches TV and does housework with his fiancé (Doc. 9-1, p. 78/728). Williams can sweep, mop, and wash dishes, but does not know how to cook (Doc. 9-1, p. 80/728). Williams walks with his fiancé while she shops for groceries (Doc. 9-1, p. 79/728).

Williams testified that he can pick up and carry about 25 pounds on a good day, but sometimes he drops things (Doc. 9-1, p. 79/728). Williams then admitted he was guessing that he could lift 25 pounds and could not remember the last time he did so (Doc. 9-1, p. 88/728). Williams testified he usually has three good days and four bad days in a week (Doc. 9-1, p. 79/728). On a bad day, Williams does not do anything (Doc. 9-1, p. 79/728). Williams can use a self-propelled mower early in the morning to mow his yard (Doc. 9-1, p. 80/728). He does not need help bathing and dressing (Doc. 9-1, p. 80/728).

Williams testified he can: (1) stand about 30 minutes to an hour before he needs a break; (2) sit two to three hours; (3) briefly grip something small with his left hand, but cannot grip and make a fist; and (4) mostly uses his left hand to balance things (Doc. 9-1, pp. 86-87/728). Williams then admitted he was guessing that he could sit

two to three hours, and only knows for sure that he can sit for an hour (the length of an AA or NA meeting) (Doc. 9-1, p. 88/728).  Williams cannot stay focused and follow instructions, and he stays away from other people (Doc. 9-1, p. 87/728).

Williams testified his fiancé makes sure he eats right (Doc. 9-1, p. 70/728). Williams checks his blood sugar himself (Doc. 9-1, p. 80/728).  Williams's blood sugar has been running between 200 and 400 in the last month, despite taking his shots every day (Williams checks his blood sugar himself) (Doc. 9-1, p. 81/728).  Williams testified he does not have Medicaid, but his son helps him get his medications (Doc. 9-1, p. 81/728).  Williams takes sleeping pills to help him sleep (Doc. 9-1, p. 81/728). During the day, he watches TV, takes care of his garden, and talks to visitors (Doc. 9-1, pp. 81-82/728).

Williams testified that he was hospitalized about a year before because he passed out due to high blood sugar (897) (Doc. 9-1, p. 83/728).  Williams testified that he did not take care of himself when he was using drugs and alcohol, but since then he has focused on caring for himself (Doc. 9-1, p. 84/728).  Williams gets his medication from Moss Memorial Hospital (Doc. 9-1, p. 84/728).

Williams testified his left hand was burned by an iron when he was about four years old, and he has had difficulty with gripping, holding, and closing his hand since that time (Doc. 9-1, p. 90/728).  Williams was unable to do certain jobs because of problems with his left hand (Doc. 9-1, p. 90/728).

Dr. Jerry Whiteman, Ph.D., testified that he is a psychologist and has been licensed to practice in Louisiana since about 1982 (Doc. 9-1, pp. 98-99/728).  Dr.

Whiteman confirmed the opinion in his 2009 and 2013 evaluations that Williams was not malingering (Doc. 9-1, p. 102/728).  Dr. Whiteman also confirmed his statement that Williams has difficulty handling finances (Doc. 9-1, p. 102/728).  Dr. Whiteman testified that Williams's verbal IQ score was 66 and overall IQ was 71 (Doc. 9-1, pp. 105/728).  Dr. Whiteman further testified that a mentally retarded individual would not necessarily have deficits in adaptive behavior (Doc. 9-1, p. 107/728).  Based on Williams's testimony, Dr. Whiteman estimated Williams has deficits in adaptive behavior and recommended separate testing for that (Doc. 9-1, p. 107/728).  Dr. Whiteman also testified that Williams had the same IQ scores and deficits in adaptive behavior prior to age 22 (Doc. 9-1, p. 108/728).    Williams's verbal IQ score of 66 represents mild mental retardation in that domain (Doc. 9-1, p. 108/728).

The VE testified that Williams's prior work as a construction laborer is titled in the DOT as construction worker II, DOT 869.6878-026, very heavy, unskilled, SVP 2 (Doc. 9-1, p. 109/728).

The ALJ posed a hypothetical question involving a person of Williams's age (but before he was 50 years old), education, and work experience; who is limited to indoor, sedentary work; who can follow simple, repetitive, one, two, three-step instructions; cannot deal with the public; cannot read and write unless it is very basic; and has a limited ability to use his non dominant upper extremity for gripping, grasping, fingering, and feeling (Doc. 9-1, p. 110/728).  The VE testified there are not be any jobs at the sedentary level that allow for not using the left hand (other than generally as a guide) (Doc. 9-1, p. 110/728).

### D.    ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Williams (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

In this case, the ALJ found that Williams has not engaged in substantial gainful activity since the alleged onset date of August 15, 2008 (Doc. 9-1, p. 18/728).  The ALJ further found that, from August 15, 2008 through June 1, 2014, Williams had a severe impairment of borderline intellectual functioning (Doc. 9-1, p. 18/728).  The ALJ also found that, since June 15, 2008, Williams has had the residual

17

functional capacity to perform heavy work except for his inability to understand, remember, or carry out more than simple and routine one-, two-, or three-step instructions; his inability to perform work requiring more than simple reading, writing, or arithmetic; and his limitation to making only simple, work-related decisions or judgments (Doc. 9-1, p. 20/728).

The ALJ further found that, since June 2, 2014, Williams has had additional severe impairments of diabetes mellitus and left hand dysfunction. The ALJ found that Williams's impairments, together, equal the criteria for intellectual disability, § 12.05(C) of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Doc. 9-1, p. 23/728). The ALJ concluded that Williams was not disabled prior to June 2, 2014 but became disabled on June 2, 2014 and remained disabled through the date of his decision on August 26, 2015 (Doc. 9-1, p. 25/728).

Williams contests the ALJ's finding that he was not disabled from August 15, 2008 to June 2, 2014.

## II.    Law and Analysis

### A.    Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See

Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence, and to correct errors of law.  See Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## B.    The ALJ did not err in failing to employ a psychology/psychiatry expert.

Williams argues the ALJ failed to employ a medical expert trained in psychology/psychiatry, 20 C.F.R. § 404.1527, 416.927, HALLEX 1-2-530,[4] to

---

[4] HALLEX is the SSA Hearings, Appeals, and Litigation Law Manual.

determine whether Williams suffered from severe borderline intellectual functioning or severe intellectual disability[5] from August 15, 2008 to June 4, 2015, SSR 83-20. Williams contends the ALJ found his mental disability is a "slowly progressive impairment" that had an onset date in 2008 and became disabling in June 2014. Williams argues the ALJ erred as to the onset date of his intellectual disability. Williams appears to misunderstand the ALJ's decision.

First, to clarify, "borderline intellectual functioning" is a medical term that refers to an IQ range. "Intellectual disability" refers to a set of criteria for disability in the social security regulations. The two terms do not refer to different levels of intellectual functioning. Someone with borderline intellectual functioning may be intellectually disabled within the meaning of the Social Security Act.

Second, it must be noted that Listing 12.05 was recently amended and Paragraph C was removed. See Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01, 2016 WL 5341732 (9/26/2016) (eff. 1/17/2017). The amended Listing 12.05 generally applies to claims filed on or after January 1, 2017 and is not applicable to this case.[6] Any cites are to the old Listing 12.05 applicable to claims filed prior to 2017.

---

[5] "Intellectual disability" was formerly known as "mental retardation" in the Social Security regulations. See Williams v. Colvin, 2014 WL 4626354 at *3, n.3 (N.D. Tex. 2014); see also "Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 F.R. 46499-01, 2013 wl 3936340 (2013).

[6] The SSA stated that it will use the new rules on or after their effective date in any case in which it makes a determination or decision. The SSA expects the Federal courts will review its final decisions using the rules that were in effect at the time it issues the decisions. See 81 FR 66138-01 at n.1. See also Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) (congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result); Sierra Med. Center v. Sullivan, 902 F.2d 388, 392 (5th Cir. 1990).

Listing 12.05 contains a diagnostic description that provides:

Intellectual disability refers to significantly sub average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Listing 12.05 lists four sets of criteria (paragraphs A through D). "The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." See id. Requirement "C," the provision raised by Williams, is satisfied with evidence of the following:

C. A valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

See id. Plaintiff must separately satisfy both the diagnostic description, requiring evidence of sub-average intellectual functioning during the developmental period, and the criteria set forth in paragraph C, to be deemed disabled under this provision of the Listing. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A (2016); see also, Randall v. Astrue, 570 F.3d 651 (5th Cir. 2009).

The ALJ stated "the medical evidence of record has demonstrated IQ scores in the appropriate range, with sufficient indication of having manifested before the required age [22]" (Doc. 9-1, p. 24/728). The ALJ further stated that Williams's condition was medically equivalent to 12.05(C) because the medical evidence of June 2014 (Doc. 9-1, pp. 652-68/728) established that Williams has a burned left hand with residual functional limitation; hepatitis C with a very high viral load; uncontrolled insulin-dependent diabetes mellitus with associated neuropathy (for which he takes

Neurontin); and symptoms of dizziness, fatigue, blurry vision, malaise, and weight loss of 30-40 pounds between January and June 2014 (Doc. 9-1, p. 24/728). The ALJ explained (Doc. 9-1, p. 20/728):

> In this instance while the requisite IQ score was present prior to June 2, 2014, none of the remaining findings appropriate to the above listing [12.05] were in the record. …Therefore, because of these evidentiary deficiencies I cannot find a listing level impairment prior to the above date.

Since the ALJ found Williams suffered from borderline intellectual functioning prior to age 22, Williams's argument is moot. The ALJ found that Williams's disability onset date for intellectual disability (Listing 12.05(C)) was in June 2014 because that is when he was diagnosed with diabetes. The ALJ found Williams's left hand impairment, diabetes, and borderline intellectual functioning, together, equal Listing 12.05(C).

Substantial evidence supports the ALJ's/Commissioner's finding that Williams's disability onset date was June 2014.

**D.** **The ALJ applied the correct severity standard and did not err by failing to employ a medical expert.**

Williams also argues the ALJ failed to apply the correct severity standard, Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985), to the claimant's combined impairments; failed to elicit the informed judgment of a medical advisor; and failed to obtain an expert opinion in internal medicine to determine whether the claimant suffered from severe essential hypertension during from August 15, 2008 through September 30, 2010 (the date last insured for DIB).

Williams argues the ALJ failed to "fully and fairly develop the intellectual disability issue" through expert medical testimony.  Williams argues, erroneously, that the ALJ found Williams only suffered from "borderline intellectual functioning" prior to June 2, 2014.  The ALJ did not find that Williams's IQ scores changed between 2008 and 2014 (Doc. 9-1, p. 23/728).  The ALJ found Williams's intellectual impairment existed before he was 22 years old.  The ALJ also found that, beginning June 2, 2014, Williams suffered from other severe impairments that, in combination with his borderline intellectual functioning, equaled Listing 12.05(C).  Since Williams's intellectual disability was not a slowly progressive impairment, Williams cannot show prejudice arising from the ALJ's failure to employ a medical/mental health expert to establish the disability onset date for his intellectual impairment. The ALJ did not err in failing to employ a medical expert.

Williams also complains the ALJ failed to employ a medical expert to determine whether Williams suffered from severe essential hypertension from August 15, 2008 through September 30, 2010.  Williams contends that essential hypertension together with intellectual disability met Listing 12.05.

The ALJ found that, although Williams suffered from hypertension from 2009 through 2014, he had not suffered end organ damage (Doc. 9-1, p. 19/728).  The ALJ concluded that Williams's hypertension did not affect his ability to work from 2008 to 2014 (or after that) and, therefore, was not severe.[7]  A severe impairment has a more

_____

[7] The ALJ also found Williams had been noncompliant with his hypertension medication.  If a claimant does not follow the prescribed treatment without a good reason, he will not be found disabled.  20 C.F.R. § 404.1530(b).  As the ALJ noted, Williams stated more than once that he had been addicted to

than minimal effect on a person's ability to work.  See Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985).  The ALJ applied the correct standard for severity to Williams's hypertension, and correctly found the evidence did not show that Williams's hypertension was severe at any time.

Also, although Williams was diagnosed with "trigger finger" in 2009 (Doc. 9-1, p. 577/728), Dr. Babineaux found Williams was still able to do most fine dexterous movements and could grip and make a fist (Doc. 9-1, p. 727/728).  Therefore, the ALJ did not clearly err in concluding Williams's trigger finger did not interfere with his ability to work prior to June 2014.

Therefore, substantial evidence supports the ALJ's/Commissioner's findings that Williams's hypertension and trigger finger were not severe between 2008 and June 2, 2014.

## III.    Conclusion

Based on the foregoing, IT IS RECOMMENDED that Williams's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such

---

drugs and alcohol and had not taken his medication.  Therefore, the ALJ did not err in failing to find Williams has "severe" hypertension or in failing to employ a medical expert as to this issue.

as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __17th__ day of January, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge